Kellee Jo BEARD, et al.,
Plaintiffs–Appellees,

v.

Julia TESKA, etc., et al., Defendants–Appellants.

No. 93–5015.

United States Court of Appeals,
Tenth Circuit.

July 26, 1994.

944

Kay Harley, General Counsel for the Oklahoma State Dept. of Educ. and State Bd. of Educ. (Susan B. Loving, Atty. Gen. of Oklahoma and Sue Wycoff, Sr. Asst. Atty. Gen., on the brief), Oklahoma City, OK, for defendants-appellants.

R. Thomas Seymour of R. Thomas Seymour, Attys., Tulsa, OK, for plaintiffs-appellees.

Before BALDOCK, and EBEL, Circuit Judges and SHADUR, Senior District Judge.*

SHADUR, Senior District Judge.

This fee dispute stems from an offshoot of a 1985 civil rights action that sought the reform of the conditions and treatment of severely handicapped patients at Hissom Memorial Center ("Hissom"), a residential facility in Sand Springs, Oklahoma.[1] In 1987 the

---

* The Honorable Milton I. Shadur, Senior United States District Judge for the Northern District of Illinois, sitting by designation.

1. That case spawned its own fee controversy, which we addressed in *Homeward Bound, Inc. v. Hissom Memorial Center,* 963 F.2d 1352 (10th Cir.1992).

district court ordered a severance of the issue of the education of school-age children at Hissom because that issue did not concern conditions or treatment at the Center. Accordingly a separate action was brought on behalf of a class of those children against Oklahoma's Department of Education ("Education Department") and Department of Human Services ("Human Services Department"),[2] Sand Springs School District ("Sand Springs") and nine individuals, seeking relief under (1) 42 U.S.C. § 1983 ("Section 1983"), (2) the Individuals with Disabilities Education Act ("IDEA," 20 U.S.C. §§ 1400–1484a)[3] and (3) the Rehabilitation Act (29 U.S.C. § 794).

In June 1990 the plaintiff class, Departments and Sand Springs entered into a Settlement Agreement under which Education Department assumed the responsibility:

1. to enter into contracts with local school districts for the education of class members (III.2[4]);

2. to provide the "technical assistance" and "staff, materials, equipment, and other resources necessary" to aid the local districts in formulating the Individual Education Programs ("IEPs") required under IDEA (III.7, VI.1);

3. to insure that each IEP generally complies with the requirements of federal law (V.1) and particularly includes an extended school year ("ESY") where appropriate (V.3.(h));

4. to design and implement training programs for the personnel who will educate or supply related services to class members (VII.1); and

5. to provide a "monitoring enforcement capacity" in the form of oversight procedures and periodic sampling "to determine whether each class member is be-ing provided with an appropriate education under State and Federal law" (VIII.1).[5] In August 1990 the Settlement Agreement was approved by the district court. But the following May the plaintiff class moved to withdraw its request for such embodiment of the Settlement Agreement in a court order, a motion granted by the district court on June 4, 1991.

Meanwhile in September and October 1990 Departments and Sand Springs stipulated to an award of $150,000 in attorney fees for work performed by plaintiff class counsel Louis Bullock ("Bullock") culminating in the Settlement Agreement. Then in July 1991 and February 1992 the plaintiff class made two additional applications for attorney fees and expenses for work that it said had been performed in securing compliance with the Settlement Agreement. After the plaintiff class settled with Sand Springs for $15,950 it proceeded against both Departments for roughly an additional $160,000. After a hearing that occupied portions of three days in July and August 1992 (the "Hearing"), on December 18, 1992 the district court's Order Fixing Attorney Fees ("Fee Order") awarded $144,630.12 in fees and expenses to be paid by Departments (which had agreed at the outset of the Hearing that there need be no allocation of any fees awarded as between them).

Departments now appeal that award. They do not challenge the lodestar approach to the fee award (reasonable hours times reasonable hourly rates), but they quarrel with each component of that approach. First, they assert that the total allowable hours should not have included time spent on three matters that were not properly chargeable against them:

1. a proceeding brought to obtain an ESY for 53 members of the plaintiff class;

---

2. For convenience this opinion will refer to Education Department and Human Service Department collectively as "Departments."

3. Our citations to IDEA will also take the form "Section—," employing the Title 20 numbering rather than the statute's internal numbering scheme. That usage should not create confusion with our similar references to the fee-shifting sister section to Section 1983, 42 U.S.C. § 1988(b) (cited "Section 1988(b)"), given the substantial difference between the latter numbers and the IDEA section numbers.

4. These roman and arabic numeral citations are to sections of the Settlement Agreement.

5. Although Human Services Department and Sand Springs also assumed obligations under the Settlement Agreement, that proves irrelevant to the resolution of this appeal.

2. a due process claim brought on behalf of class member Julie Paulson ("Paulson") against the Tulsa Public Schools ("Tulsa"); and

3. work done in connection with the claim of a teacher in the Catoosa School District ("Catoosa") who asserted that she had contracted genital herpes from a member of the plaintiff class enrolled there.

Second, they dispute the reasonableness of the across-the-board $200 hourly rate that the district court approved for three of the plaintiff class' lawyers (Bullock, Frank Laski ("Laski") and R. Thomas Seymour ("Seymour")) because, they say:

1. $200 is an excessive hourly rate for services in this area of the law in all events; and

2. we should endorse the concept of awarding different hourly rates for work requiring different levels of skill.

We affirm the district court in part and reverse it in part.

*ESY Matter*

While members of the plaintiff class were at Hissom, Sand Springs had provided them with extended school programs—extending into the summer months. At the end of the normal school year in May 1991, however, school districts affording education to 53 class members refused to provide them with education during the coming summer. On May 15, 1991 the plaintiff class filed a very short Second Amended Complaint ("SAC") adding the allegation that Sand Springs had conspired to prevent other school districts from providing an ESY for class members. Though the SAC's case heading simply read *Kellee Jo Beard, et al. v. The Hissom Memorial Center, et al.*, its first paragraph stated:

The plaintiffs adopt and replead, as if included in this complaint, all of the allegations and claims included in their First Amended Complaint previously filed herein.

That First Amended Complaint ("FAC") had employed the complete case heading in this case, listing both Departments among the other defendants. What the SAC requested

by way of relief was a "Temporary Restraining order, Preliminary Injunction and Permanent Injunction, ordering Sand Springs," among other things, to provide an ESY to all class members who qualified for such services.

At a hearing the very next day, where both Departments were represented by counsel, Education Department's counsel stated that it "has not insisted at this point that all of the programs be IEP driven" and "I don't believe our Policies and Procedure Manual speaks to guidelines for extended school year." At the conclusion of the hearing the district court stated:

We're going to get everyone involved who needs to be involved.... I will direct the plaintiff to make the appropriate additional parties to these proceedings those school districts that are affected.

And on that same day the district court entered this minute order:

On TRO & Prel. Inj.: Pltfs to involve all school districts in attempt to resolve problems in accordance w/Settl. Agreement. Hearing reset for 5–28–91, 10:00am. No TRO or Inj. issued.

Because the amicable resolution that the district court had hoped for was not reached by May 28, on that day it issued another minute order:

Court orders joinder of addl. parties & encourages parties to cont. to follow law & work together to resolve.

On July 2, 1991 the plaintiff class filed a Third Amended Complaint ("TAC"), which named nine school districts (collectively the "School Districts") as defendants but dropped Sand Springs. In much greater detail than the SAC, the TAC alleged that the School Districts were failing to provide class members with appropriate IEPs that included an ESY.[6] When at the beginning of the 1991 fall semester the 53 class members were still not being provided with any education at all, on August 29, 1991 the district court orally directed the plaintiff class to file an amendment to its application for a preliminary injunction, naming Education Department as a defendant. And the plaintiff class

6. Again the TAC's first paragraph adopted "all of the allegations and claims" made in the FAC.

did just that on September 4 by filing a "Motion for a Preliminary Injunction Against the State Department of Education," asking that the latter be required to fulfill its obligations under Section 1414(d)(3) to insure that the 53 students receive the "free appropriate public education" to which they are entitled.

On September 11 Education Department's board ("Board") passed a resolution acknowledging in part that:

the Board and the State Department of Education is responsible and obligated under Federal Statute and regulations to assure that all children and youth with disabilities in Oklahoma have available a free appropriate public education....

It went on to order the School Districts to educate the 53 students from September 16, 1991 until an October 1 scheduled court hearing. On September 13 Education Department filed a cross-claim against the School Districts to enforce that order. Three days later the School Districts responded, alleging that it was not their fault that the 53 students were not being educated, but rather Education Department's for having failed to meet its obligations under the Settlement Agreement.

That finger-pointing came to an end on October 2, 1991 when Education Department's counsel Robert Nance ("Nance") informed the district court during an in-court oral Settlement Announcement:

I believe [the settlement is] a creative solution to what was a difficult problem. Under it the State Department of Education will undertake to provide direct services to the 53 students in question through contracts which we understand will be signed by several of the local school districts. We assume the responsibility for providing that education.

On that same day the district court entered an order "sustaining def School Districts' mot/dism." And in its much later Fee Order the district court said:

5. The Court finds in respect to the extended school year issue that Plaintiffs

are entitled to compensation for time spent on that issue. Plaintiffs' counsel were directed by the Court to join the contracting school districts. This joinder was the catalyst for the Plaintiff class securing extended school year services in integrated settings.

6. The time expended by Plaintiffs' counsel on the extended school year issues including the joinder of the school districts was necessary and reasonable and Plaintiffs' counsel is entitled to compensation in this area and in the amounts claimed.

*Paulson Matter*

On January 7, 1991 Bullock wrote to Tulsa requesting a due process hearing to object to the IEP that it had developed for Paulson. That hearing was never held because the matter was settled. On March 26, 1991 Bullock wrote Tulsa's counsel "to memorialize our agreement" that Paulson's due process claim would be held in abeyance until October 1991 and would then be dismissed if it were established:

(1) That a new IEP is drawn for Julie Paulson for the remainder of the semester and (2) That Ms. Hightower certifies that Tulsa has continued to work in a positive manner to implement an appropriate IEP process and has substantially implemented such a system.[7]

Bullock's letter said that Tulsa teachers were to be trained "to prepare IEPs on the basis of assessments[,] ... measurable goals with measurable short-term objectives ... stress[ing] functional skills."

At the later Hearing Bullock testified:

The magistrate held several lengthy settlement conferences between myself and Tulsa School District and a resolution was arrived at which did move Tulsa School District in the direction, for the class at least, that we had hoped.

But that suggestion as to a broader significance of the individual Paulson resolution had been sharply controverted by Tulsa's lawyer in a May 17, 1991 response to Bull-

---

7. Ms. Hightower was part of the Technical Assistance Group whose job was to advise and assist

Education Department in implementing the Settlement Agreement.

ock's March 26 letter, rejecting any notion that the Paulson settlement extended beyond that individual case to Tulsa's general preparation of IEPs (as Bullock had sought in point (2) of his letter). In all events Bullock voluntarily dismissed Paulson's due process claim without having secured Tulsa's agreement to that second point and without Department ever having been brought into the matter. Nonetheless, what the district court said about the Paulson matter in the Fee Order was this:

> 7. Counsel for the Plaintiff class have responsibility to insure that individual class members receive relief set forth in the Settlement Agreement. The Defendants' objections are not well taken. The Court finds that counsel's participation in the Julie Paulson due process and Catoosa school issues were reasonable and necessary. Both of these issues were within the purview of the Settlement Agreement and, although they involve individuals, it was essential to the enforcement of the Settlement Agreement that Plaintiff provide representation both for the Paulson issue and the Catoosa school issue.

### Catoosa Matter

Early in the 1990–91 school year it became obvious that six class members at Catoosa were not receiving an appropriate education. Instead they were effectively being warehoused—the teacher and her staff would stand around the edges of the school room instead of interacting with the class members. Outside personnel were brought in to help, and the problem was resolved.

Departments do not quarrel with the fee award to the extent that it relates to that systemic problem. Instead they reject any obligation to pay for an individual dispute in which a teacher claimed to have contracted genital herpes from one of the students. In an effort to bring his services in resolving that matter under the mantle of enforcement of the Settlement Agreement (and hence to obtain payment from Departments), Bullock testified:

> Catoosa started to become immeasurably better and it went from being a real prob-

lem to what we thought was a real success until we—there was a client out there who [had] some particular problems, they were real episodic and they exploded, but sort of at the height of dealing with her problems the teacher begins telling everyone that she has received genital herpes from one of the students. Well, the campus that we just thought had relaxed, it explodes again and they have a huge meeting down there.

Bullock said that ultimately the "situation" at Catoosa was "defused" so that:

> by the end of the school year Catoosa really had probably one of the best programs for people with severe disabilities in this area and probably in the state.

We have already quoted the Fee Order's holding about the Catoosa matter, and it need not be repeated here.

### Hourly Rate

As we have said, the district court approved the requested hourly rate of $200 for all of the work of Bullock, Laski and Seymour and a $145 hourly rate for Patricia Bullock. Bullock presented this evidence in support of his own rate:

> 1. He regularly charges $200 per hour for his services.

> 2. In the stipulated-to award of attorney fees in June 1990, his work was calculated at an hourly rate of $192.50 ($175 plus a 10% enhancement).

> 3. In individual civil rights cases that he had previously resolved with Human Services Department, he had calculated his fee at $200 per hour.

Bullock also testified that he had not included in his fee request some other work performed for the plaintiff class:

> 1. conferences with co-counsel Patricia Bullock, which he said amounted to 10–15% of the total time spent on the case;

> 2. time spent reviewing 124 pieces of correspondence; and

> 3. time spent in 170 telephone calls.

Finally, evidence was submitted that Seymour and three other Tulsa lawyers in private practice charge between $200 and $225 per hour for their services (which do not

include any work in the areas of law involved here).

Departments responded with two witnesses' testimony dealing with hourly rates. Because a major portion of that testimony was the only evidence at the Hearing that sought to address prevailing market rates in the relevant area of law (as distinct from the rates customarily charged for other services by the individual lawyers for the plaintiff class), we set it out in some detail.

John Moyer ("Moyer"), whose specialty for the last 10 years has been "education law, school law, and particularly in handicapped education law," who has handled "200 or more" Education of the Handicapped Act ("EHA") and IDEA cases and who has taught at national as well as local and regional seminars in all the above-quoted areas of his specialty, charges from $110 to 140 per hour for his time. Indeed, in this case he represented the School Districts (other than Sand Springs) at a $110 hourly rate. Additionally, he is familiar with "the fewer than half dozen" "lawyers who make this their specialty in Oklahoma," and their charges all range between $90 and $140 per hour.

Lana Tyree ("Tyree"), a lawyer certified by the district court as "an expert in the field of education and civil rights law," testified at length on the issue. Tyree spends 60–65% of her time on "education or school law related" matters, has represented school districts, individual students and legal associations, has worked on EHA and IDEA cases and has done 100–150 due process hearings. She charges $100 to $125 per hour for such legal services. She knows the fees charged by "most of" the "six or seven people that I think are generally considered to be recognized as regular and routine practicing specialists in" educational law in Oklahoma. She knew the ranges of hourly rates charged by five of them other than Moyer (respectively $75–90, $75–110, $75–125, $125 and $60–65), but she viewed the last attorney's fees as non-representative because he "has the advantage of no overhead."

Tyree also testified as to a national survey covering the period from 1980 to 1991 that disclosed 70 IDEA-type cases where attorney's fees were awarded, with the prevailing national rate for such work being $125 per hour. Of those 70 cases, only two awarded more than $135 per hour, one awarded $135 and the remaining cases awarded rates of $125 or less.

Based on all that information, Tyree opined that the prevailing market rate in the community for "traditional time recognized by other courts as having substantive legal significance in terms of what lawyers normally do and for what we are paid our best fees" was $125 per hour. Much of Tyree's other testimony was devoted (1) to detailing and calculating the effects of her contention that lesser hourly rates should be chargeable for matters that she characterized as "secondary legal time" and work that was "ministerial in nature, not things that necessarily required a lawyer" and (2) to her view that Patricia Bullock should be paid at a lesser hourly rate ($110 rather than $125). Because of the views that we later express on those subjects, we need not provide evidentiary chapter and verse in those respects.

In the portion of its Fee Order in which it ruled on the proper hourly rate (Order ¶¶ 8–10 and 12), the district court focused on the "reasonableness" of the rate charged by each attorney working on behalf of the plaintiff class in light of the lawyer's own "reputation," "experience" and "skill." Nothing was said, however, about the standard that (as we later explain) the case law commands: the prevailing market rate for the type of services involved in this case. Finally, as to the variable rate concept that had been urged by Tyree, the Fee Order stated:

11. The Court does not agree with the Defendant that attorney's rates should be divided into multiple categories. The rate is based upon an attorney's education, training, experience and expertise and the Court declines to adopt the multiple category approach to rate fixing.

*Substantive Legal Standards*

IDEA mandates that an IEP be formulated for every child who is "disabled" within the statutory definition (see Section 1401(a)(1) and (15)). We have described that

requirement in *Association for Community Living v. Romer,* 992 F.2d 1040, 1042–43 (10th Cir.1993):

> The IDEA is a comprehensive statute enacted to ensure that all children with disabilities have access to "a free appropriate public education ... designed to meet their unique needs." 20 U.S.C. § 1400(c); *see also Honig v. Doe,* 484 U.S. 305, 309 [108 S.Ct. 592, 596, 98 L.Ed.2d 686] (1988). The primary mechanism for implementing this goal is an individualized education program ("IEP"), which the act mandates for each child with a disability, tailored to the child's unique needs. 20 U.S.C. §§ 1401(a)(18), 1414(a)(5); *Honig,* 484 U.S. at 311 [108 S.Ct. at 597]. The IEP is a written statement that sets forth the child's present performance level, goals and objectives, specific services that will enable the child to meet those goals, and evaluation criteria and procedures to determine whether the child has met the goals. 20 U.S.C. § 1401(a)(20).

Where the requirements of an IEP or any of IDEA's other strictures are not met, the parent or guardian of a disabled child may request "an impartial due process hearing" (Section 1415(b)(2) and (c)) and may appeal an adverse decision reached there to the federal courts (Section 1415(e)(1) and (2)). To remove the disincentive to potential plaintiffs of using those legal remedies because of the cost of pursuing them, Section 1415(e)(4)(B) provides:

> In any action or proceeding brought under this subsection the court, in its discretion, may award reasonable attorneys' fees as part of the costs to the parents or guardian of a child or youth with a disability who is the prevailing party.

■ Even though neither the ESY dispute nor the Catoosa matter traveled the due-process-hearing path, we agree with the parties' implicit view that Section 1415(e)(4)(B) is also applicable to enforcement of a Settlement Agreement implementing IDEA's mandates. And although this case marks this Circuit's first opportunity to apply that provision, we do not write on a clean slate. Congress itself announced, in H.R.Rep. No. 296, 99th Cong., 2d Sess. 5 (1985) and S.Rep. No. 112, 99th Cong., 2d Sess. 13 (1985):

> It is the Committee's intent that the terms "prevailing party" and "reasonable" be construed consistent with the U.S. Supreme Court's decision in *Hensley v. Eckerhart,* 461 U.S. 424, 440 [103 S.Ct. 1933, 1943, 76 L.Ed.2d 40] (1983).

Because *Hensley* dealt with attorney's fee awards under Section 1988(b), all of the Circuits that have addressed Section 1415(e)(4)(B) claims have drawn on Section 1988(b) precedents.[8] We see no reason to do otherwise.

Like its IDEA counterpart, Section 1988(b) limits eligibility for its awards to a "prevailing party" in the statutory sense (see *Hewitt v. Helms,* 482 U.S. 755, 760, 107 S.Ct. 2672, 2675, 96 L.Ed.2d 654 (1987)) and the amount of its awards to "a reasonable attorney's fee"—which in some circumstances may be "no fee at all," *Farrar v. Hobby,* —— U.S. ——, —————, 113 S.Ct. 566, 574–75, 121 L.Ed.2d 494 (1992). Departments' objections to the fee award bear on both of those requirements, and we approach their objections from that analytical framework.

### Prevailing Party Status

*Farrar,* —— U.S. at ——, 113 S.Ct. at 573 has reconfirmed the teaching of *Texas State Teachers Ass'n v. Garland Independent Sch. Dist.,* 489 U.S. 782, 792–93, 109 S.Ct. 1486, 1494, 103 L.Ed.2d 866 (1989):

> The touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties.

That "touchstone" is a precondition to "prevailing party" status (*Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 3104, 87 L.Ed.2d 114 (1985)):

---

8. See *Christopher P. v. Marcus,* 915 F.2d 794, 804 n. 9 (2d Cir.1990); *Wheeler v. Towanda Area Sch. Dist.,* 950 F.2d 128, 132 (3d Cir.1991); *Combs v. School Bd. of Rockingham County,* 15 F.3d 357, 360 (4th Cir.1994); *Angela L. v. Pasadena Indep. Sch. Dist.,* 918 F.2d 1188, 1193 (5th Cir.1990); *Krichinsky v. Knox County Schs.,* 963 F.2d 847, 849 (6th Cir.1992); *Borengasser v. Arkansas State Bd. of Educ.,* 996 F.2d 196, 199 (8th Cir.1993); *Barlow–Gresham Union High Sch. Dist. No. 2 v. Mitchell,* 940 F.2d 1280, 1284 (9th Cir.1991).

Thus, liability on the merits and responsibility for fees go hand in hand; where a defendant has not been prevailed against, either because of legal immunity or on the merits, § 1988 does not authorize a fee award against that defendant.

No plaintiff can ever be entitled to fees against an entity against which plaintiff did not even attempt to prevail, for the unremarkable reason that (*id.* at 164, 105 S.Ct. at 3104):

> [I]t is clear that the logical place to look for recovery of fees is to the losing party—the party legally responsible for relief on the merits. That is the party who must pay the costs of the litigation . . . and it is clearly the party who should also bear fee liability under § 1988.

Most typically the necessary change in the parties' legal relationship occurs where a prevailing party obtains a legal judgment on at least part of the merits of his, her or its claim (see the entire extended discussion in *Hensley*). But at least until *Farrar* the universal view has been that such a judgment is not the sine qua non of Section 1988(b) applicability (*Hewitt*, 482 U.S. at 760–61, 107 S.Ct. at 2676):

> It is settled law, of course, that relief need not be judicially decreed in order to justify a fee award under § 1988. A lawsuit sometimes produces voluntary action by the defendant that affords the plaintiff all or some of the relief he sought through a judgment—*e.g.*, a monetary settlement or a change in the conduct that redresses the plaintiff's grievances. When that occurs, the plaintiff is deemed to have prevailed despite the absence of a formal judgment in his favor.

To much the same effect, *Maher v. Gagne*, 448 U.S. 122, 129, 100 S.Ct. 2570, 2574, 65 L.Ed.2d 653 (1980) has said:

> The fact that respondent prevailed through a settlement rather than through litigation

does not weaken her claim to fees. Nothing in the language of § 1988 conditions the District Court's power to award fees on full litigation of the issues or on a judicial determination that the plaintiff's rights have been violated.

And so we, like other Circuits, have held that Section 1988(b) fees are also awardable "if the plaintiff vindicates his or her rights through settlement" (*Duran v. Carruthers*, 885 F.2d 1492, 1496 (10th Cir.1989)) or where the plaintiff engages in "post-judgment monitoring and other efforts to ensure compliance with court orders in a civil rights case" (*Diaz v. Romer*, 961 F.2d 1508, 1511 (10th Cir. 1992), citing *Duran*, 885 F.2d at 1495). As we stated in *Foremaster v. City of St. George*, 882 F.2d 1485, 1488 (10th Cir.1989) (citations and internal quotation marks omitted):

> A plaintiff may prevail in the absence of a judicial determination on the merits. In such circumstances, we have adopted the catalyst test to determine prevailing party status for attorneys fees. A plaintiff must show (1) that [the] lawsuit is causally linked to securing the relief obtained, and (2) that the defendant's conduct in response to the lawsuit was required by law.

It is true that some language in *Farrar*, —— U.S. at ——, 113 S.Ct. at 573 (citations omitted) could be read as rendering any "catalyst" theory nonviable as a basis for awarding fees for a lawyer's services that do not produce "an enforceable judgment against the defendant from whom fees are sought, or comparable relief through a consent decree or settlement." That has been the conclusion of the Fourth Circuit in a sharply split en banc decision, *S–1 v. State Bd. of Educ.*, 21 F.3d 49, 51 (4th Cir.1994) (per curiam). But we—like all the other Circuits that have considered the issue [9] or have continued to speak in catalyst terms [10] post-*Farrar*—have not agreed with that reading (*American Council of the Blind of Colorado, Inc. v.*

---

**9.** *Baumgartner v. Harrisburg Hous. Auth.*, 21 F.3d 541, 549–50 (3d Cir.1994); *Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist., No. 1*, 17 F.3d 260, 262–63 & n. 2 (8th Cir.1994).

**10.** *Paris v. United States Dep't of HUD*, 988 F.2d 236, 241 (1st Cir.1993); *LaRouche v. Kezer*, 20

F.3d 68, 71 n. 4 (2d Cir.1994); *Watkins v. Fordice*, 7 F.3d 453, 456 (5th Cir.1993); *Citizens Against Tax Waste v. Westerville City Sch.*, 985 F.2d 255, 257–58 (6th Cir.1993); *Stewart v. McGinnis*, 5 F.3d 1031, 1039 (7th Cir.1993).

*Romer*, 962 F.2d 1501, 1503 (10th Cir.1992), *reaff'd* following grant of certiorari and remand in light of *Farrar*, 992 F.2d 249, 250–51 (10th Cir.1993)).

■ To meet the first requirement of the catalyst test as framed in *Foremaster*, a party must show that its action "is a substantial factor or significant catalyst" leading to the relief obtained (our earlier decision in *American Council*, 962 F.2d 1501, 1503 (10th Cir. 1992)). And to meet the second requirement, the party must show (*J & J Anderson, Inc. v. Town of Erie*, 767 F.2d 1469, 1475 (10th Cir.1985) (emphasis omitted), quoting *Williams v. Leatherbury*, 672 F.2d 549, 551 (5th Cir.1982):

> that the defendant's conduct was required by law, i.e., not a wholly gratuitous response to an action that in itself was frivolous or groundless.

■ We review the district court's determinations of those two issues by different standards. Because the first is a "factual issue" we consider it under the clearly erroneous standard, while "[t]he second prong ... is a legal issue" that is reviewed de novo (*American Council*, 962 F.2d at 1503; *Foremaster*, 882 F.2d at 1488; *Supre v. Ricketts*, 792 F.2d 958, 962 (10th Cir.1986)).

Finally, in connection with each of the matters at issue here, the district court awarded fees against both Departments. Because they have agreed that no allocation is called for, we will review the propriety of the district court's rulings only as to Education Department (it does not matter that Human Service Department's involvement was substantially less extensive).

*ESY Matter*

■ As to the first element of the catalyst test in connection with the ESY matter, the district court found that the entire pattern of the plaintiff class counsel's activities operated collectively as the catalyst for Education Department's settlement. That was the lower court's express holding in connection with the joinder of the School Districts, and the attorney's fee award for all of the work expended in the matter implicitly carries with it a like view as to the other legal actions taken. That determination cannot be called

clearly erroneous—indeed it appears clearly correct based on the record.

We have previously had occasion to note that the "sequence of events" can indicate whether a plaintiff's actions were the catalyst for the relief obtained (*Luethje v. Peavine Sch. Dist.*, 872 F.2d 352, 354 (10th Cir.1989)). Here the ESY matter arose when on May 15, 1991 the plaintiff class filed its SAC requesting a temporary and permanent injunction to force the School Districts to continue educating 53 class members. But even though the SAC expressly asked for that relief against Sand Springs, Education Department too was involved in the ESY matter from its inception, denying its legal obligation to supply the relief requested by the plaintiff class. Plainly the SAC was not merely "a ... significant catalyst" but *the* catalyst for enmeshing Education Department in the dispute.

After a considerable amount of legal work had been expended on the part of the plaintiff class, Education Department and the School Districts, Education Department settled the matter by announcing on October 2, 1991 that it would assume responsibility to supply the 53 children with the necessary education. Nothing even hints that Education Department would have done so without the legal actions taken by the plaintiff class (see *Combs*, 15 F.3d at 361). Indeed, Education Department's initial denial at the May 16 hearing of any responsibility for the education of the 53 children is overwhelming evidence to the contrary.

Education Department nevertheless contests the award because (1) the action against Sand Springs and the School Districts was ultimately dismissed and (2) the plaintiff class never actually sued Education Department. Neither contention is at all persuasive.

As for the first contention, it is of course the circumstances rather than the fact of dismissal that controls. Settlement of a dispute is enough to confer prevailing party status, and the normal course in the wake of settlement is for the district court to dismiss the underlying suit. Education Department chooses to ignore the fact that the suit against Sand Springs and the School Dis-

tricts was dismissed *on the same day* that Education Department settled the matter.

Here the plaintiff class was pursuing only one claim and requesting only one discrete type of relief: to insure the continued education of the 53 class members. It was irrelevant to the plaintiff class just who provided that relief, so long as it was in fact provided. This was not the type of situation in which a plaintiff pursues several different claims against different parties, so that it is possible for it to be a "prevailing party" as to some claims against some parties but not as to other claims against others (as in, e.g., *Rode v. Dellarciprete,* 892 F.2d 1177, 1185–86 (3d Cir.1990)). Once Education Department assumed the responsibility to educate the 53 children, the plaintiff class had nothing further to complain about and hence no logical reason to continue that phase of its action against anyone.

As for Education Department's other argument that it was never sued by the plaintiff class (at least until the TAC was filed), it is not entirely clear whether that is so even in a mechanistic sense. It will be remembered that the initial paragraph of the SAC realleged all the claims of the earlier FAC, including those asserted against Education Department. And it will also be recalled that Education Department's counsel was in on the ESY matter from the outset, beginning with the hearing held the day after the SAC was filed. But no matter what the formalities, it remains true that the initial proceeding and all those that ensued marked out a continuous line leading to Education Department's capitulation to the ESY demand that had been made by the plaintiff class—a classic illustration of the necessary causal linkage.

■ That leads to the second element of the catalyst test: whether in settling the matter Education Department took a position required by law, as opposed to conferring "a wholly gratuitous" benefit on the plaintiff class. In statutory terms IDEA imposes on the "State educational agency" (Section 1412(6)) the obligation to assure that the IEP and other requirements be carried out— and that agency is defined in Section 1401(7) in terms of the body having primary respon-

sibility under state law. In this instance Education Department's own Board expressly acknowledged that it fit that description in its September 11, 1991 resolution. That acknowledgment meshed directly with the legally binding obligations that Education Department undertook in favor of the plaintiff class in the Settlement Agreement. And one of those specific obligations was the duty to insure that IEPs conformed to IDEA's requirements—and that they particularly provided an ESY wherever appropriate.

Under those circumstances the plaintiff class' action seeking an ESY for the 53 class members cannot even arguably be viewed as "frivolous or groundless," nor can Education Department's agreement to settle be construed as "wholly gratuitous." Instead Education Department really acknowledged that its response was "required by law," so as to satisfy the second prong of the catalyst test as well.

*Paulson Matter*

■ No like conclusion is justified as to the Paulson matter, for the record reflects no relief as having been obtained by the plaintiff class from either Department in that matter. Nor is there evidence that either Department assumed legal responsibility for that relief. Such total noninvolvement on their part in the underlying substantive dispute compels the denial of any fee award against them on any theory of direct liability. As *Kentucky v. Graham,* 473 U.S. at 170, 105 S.Ct. at 3107 put the matter succinctly:

> There is no cause of action against a defendant for fees absent that defendant's liability for relief on the merits.

In short, it cannot be said that the plaintiff class was a "prevailing party" against either Department.

Definitive case law teaches that there is only one instance in which an entity that has not been prevailed against may nevertheless be liable for fees under Section 1988(b): where "federal law" makes that entity "substantively liable on a *respondeat superior* basis" for the wrongdoing of the party against whom the successful litigant prevailed (*Kentucky v. Graham,* 473 U.S. at 168, 105 S.Ct. at 3106). *Kentucky v. Graham, id.*

expressly held that Section 1988(b) incorporates no such rule of vicarious liability, and we conclude that IDEA is no different in that respect.

Section 1412(6) states that the "State educational agency shall be responsible for assuring" that every child disabled within the meaning of the IDEA be provided with a "free appropriate public education." We have already held (based in part on the Board's acknowledgment) that Education Department is the "State educational agency" for that purpose. But that fact alone does not render it liable for fees under Section 1415(e)(4)(B) on a respondeat superior theory. Section 1412(6) does not turn every "local educational agency" under the statute (see Section 1401(8)) into the agent of the "State educational agency" as a matter of federal law, so that the latter automatically becomes legally liable for all transgressions of the former.

Instead the sensible (and established) reading of Section 1412(6) is that it is part of an overall statutory structure designed to impose on the States "primary responsibility for ensuring that local educational agencies comply with the requirements of the IDEA" (*Hoeft v. Tucson Unified Sch. Dist.*, 967 F.2d 1298, 1303 (9th Cir.1992); see also *Town of Burlington v. Department of Educ.*, 736 F.2d 773, 787 (1st Cir.1984), *aff'd*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985)). It would stretch that concept beyond reason to hold that any time a local agency trips up in that respect, the State agency is an absolute insurer required to make good the damage. And that is particularly the case where, as here, the local agency caved in as to the issue involved before the plaintiff class made any effort to involve Education Department in the dispute.[11]

Nor finally can the plaintiff class counsel seek access to Departments' deeper pocket by his testimony at the Hearing that the settlement of Paulson's individual case "did move Tulsa School District in the direction, for the class at least, that we had hoped."

That testimony is at direct odds with the documentation, which plainly reflects that Tulsa did *not* agree to Bullock's demand in that respect, so that he then dismissed Paulson's due process claim without having attained that broader objective. Moreover, Bullock's claim (even had it been accomplished) would have been too attenuated a thread to tie either Department into legal liability under either Section 1415(e)(4)(B) or Section 1988(b). It must be concluded that the district court's assessment of Paulson-related fees against Departments is clearly erroneous factually and unsupported legally.

*Catoosa Matter*

■ While Departments concede the appropriateness of assessing fees against them for the work performed by the plaintiff class counsel in dealing with the systemic deficiencies at Catoosa, they contend that work related to the teacher's allegation of having contracted genital herpes from one class member was "very individual" in nature, as contrasted with a "class related issue" (Departments' Br. 15), so that "[a]ny hours spent on any such issue are not reasonably billed to [Departments]." To pose the argument in *Hensley* terms, Departments urge that the disputed time was not "reasonably expended on the litigation" (461 U.S. at 433, 103 S.Ct. at 1939).

There would be a good deal of force to Defendants' position if the situation were as they portray it—that is, if the individual issue had really arisen "[a]fter the systemic issues had been dealt with." But on such factual issues the trial court record must control, and there the unrebutted testimony of plaintiff class counsel Bullock was that the two matters were inextricably intertwined—that the eruption of the individual issue threatened to torpedo the entire effort to get all six class members at Catoosa educated in accordance with IDEA's requirements. On that basis, even though the problem stemmed from a charge leveled against an individual class member, counsel's successful efforts to

---

11. That factor alone is enough to negate the effort of the plaintiff class to bring the contested activity under the mantle of enforcement of the Settlement Agreement. Its Article VIII ("Provisions Relative to Oversight and Dispute Resolu-

tion") makes it plain that Education Department is not the absolute post hoc underwriter of every individual IEP or other violation by every school district, so long as the Department itself was not directly implicated.

alleviate the resulting tensions accrued to the benefit of all class members at Catoosa by ensuring their continuing education at that school district.

Thus we cannot fault the district court's determination that the disputed Catoosa services were "essential to the enforcement of the Settlement Agreement." We uphold the assessment of fees against Departments for the work performed in that respect.

### Reasonableness of Award

As *Hensley*, 461 U.S. at 433, 103 S.Ct. at 1939 said, once a party has established its entitlement to fees as a "prevailing party":

> It remains for the district court to determine what fee is "reasonable."
>
> The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.

On both those issues of reasonableness the burden of proof is on the fee applicant (*id.* at 437, 103 S.Ct. at 1941). And on the hourly rate issue, the applicant may meet that burden by way of (*Blum v. Stenson*, 465 U.S. 886, 895 n. 11, 104 S.Ct. 1541, 1547 n. 11, 79 L.Ed.2d 891 (1984)):

> satisfactory evidence—in addition to the attorney's own affidavit—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably compared skill, experience, and reputation.

On that score "the rates charged in private representations" may be relevant (*id.*), but they are certainly not conclusive (*Ramos v. Lamm*, 713 F.2d 546, 555 (10th Cir.1983)):

> The hourly rate should be based on the lawyer's skill and experience in civil rights or analogous litigation. Lawyers working outside their fields of expertise may deserve an hourly fee lower than their normal billing rate because of their lack of experience in the civil rights field.

Counsel for the plaintiff class urges upon us that because the district court's ultimate determination as to the reasonableness of the fees awarded is a factual question, it should be reviewed under a clearly erroneous standard (*Collins v. Romer*, 962 F.2d 1508, 1514 (10th Cir.1992)). For that purpose the district court must "provide a concise but clear explanation of its reasons for the fee award" sufficient to allow appellate review (*Zuchel v. City & County of Denver*, 997 F.2d 730, 743 (10th Cir.1993), quoting *Hensley*, 461 U.S. at 437, 103 S.Ct. at 1941). So much is true—but before the district court's decision qualifies for that generous level of review, it must first have adopted the correct legal standard—a matter that we scrutinize without according the district court such deference (*Homeward Bound*, 963 F.2d at 1355):

> However, a district court's statutory interpretation or legal analysis which provides the basis for the fee award is reviewable de novo.

And as the ensuing discussion reflects, the district court's decision on hourly rates plainly erred in that respect.

In this instance Departments do not challenge the unreasonableness of the time that was expended by counsel for the plaintiff class in dealing with any issues on which fees are awardable at all. What they do attack, as a matter of law, are two aspects of the hourly rates approved by the district court, claiming (1) that $200 per hour is an excessive charge for work performed by three of the four lawyers for plaintiff class and (2) that a variable rate should be imposed depending on the skill required for different types of work. Those issues will be addressed in turn.

### Hourly Rate

In approving the $200 per hour rate for three of the four lawyers who rendered services to the plaintiff class (only Bullock's wife and partner Patricia Bullock was weighed in at a lesser $145 hourly figure), the district court perforce took primary heed of the evidence provided by Bullock (whose time accounts for the bulk of the attorneys' fees [12]). Bullock testified that the hourly

---

12. Of the nearly 650 hours spent by the three

lawyers other than Patricia Bullock, Bullock's

rate he usually charges for his services is $200, and the record reflected that he had earlier been paid $192.50 an hour by agreement of the parties for services leading to the Settlement Agreement, and that he had been paid at a $200 rate in individual civil rights cases. Seymour also provided testimony supporting a $200 hourly charge for his own representation in other litigation.

 But just as lawyers are not fungible, so too legal services are not fungible. It will be recalled that the legal standard for fee awards is a prevailing market value test. And for that purpose the relevant market value is not the price that the particular lawyer chosen may be paid by willing purchasers of his or her services, but rather the price that is customarily paid in the community for services like those involved in the case at hand.

Only a moment's thought is need to see why that is so in the context of fee awards against an adversary. There are of course different markets for different areas of lawyer's work. Lawyers who handle home closings do not bill or receive payment at the same hourly rate as lawyers who handle major corporate mergers and acquisitions—even though each may be handling a "purchase." If the home buyer chooses to retain a merger specialist because the buyer wants to take advantage of the latter's demonstrated negotiating skills, the buyer of course is free to do so and to pay the higher tariff. But if and when it comes down to fee shifting—to imposing on the other side an obligation to pay the lawyer's fee for a legally sufficient reason—the higher cost of the merger specialist cannot properly be thrust on someone who did not, after all, make the uneconomic choice of counsel.

 Little wonder, then, that in one of the comparatively infrequent cases in which it has spoken with a single voice, the Supreme Court has taught in *Blum v. Stenson* that the *prevailing market rate* and not the *cost* of providing legal services is the measure of "a reasonable attorney's fee" under Section 1988(b). It did so in the course of rejecting (on the notion of a claimed windfall)

the defendant's effort to impose a bargain basement recovery on a nonprofit law office (the Legal Aid Society), but the identical principle mandates judicial rejection of the normal billing rate of the lawyer whose clients may be willing to pay him or her more than the *prevailing* market rate for comparable services. We cannot improve on the Supreme Court's guidance as expressed in *Blum*, 465 U.S. at 895 & n. 11, 104 S.Ct. at 1547 & n. 11:

> The statute and legislative history establish that "reasonable fees" under § 1988 are to be calculated according to the prevailing market rates in the relevant community, regardless of whether plaintiff is represented by private or non-profit counsel.[11]

---

[11] We recognize, of course, that determining an appropriate "market rate" for the services of a lawyer is inherently difficult. Market prices of commodities and most services are determined by supply and demand. In this traditional sense there is no such thing as a prevailing market rate for the service of lawyers in a particular community. The type of service rendered by lawyers, as well as their experience, skill, and reputation, varies extensively—even within a law firm. Accordingly, the hourly rates of lawyers in private practice also vary widely. The fees charged often are based on the product of hours devoted to the representation multiplied by the lawyer's customary rate. But the fee usually is discussed with the client, may be negotiated, and it is the client who pays whether he wins or loses. The § 1988 fee determination is made by the court in an entirely different setting: there is no negotiation or even discussion with the prevailing client, as the fee—found to be reasonable by the court—is paid by the losing party. Nevertheless, as shown in the text above, the critical inquiry in determining reasonableness is now generally recognized as the appropriate hourly rate. And the rates charged in private representations may afford relevant comparisons.

In seeking some basis for a standard, courts properly have required prevailing attorneys to justify the reasonableness of the requested rate or rates. To inform and assist the court in the exercise of its discretion, the burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation. A rate determined in this way is normally deemed to be reasonable, and is referred to—for convenience—as the prevailing market rate.

hours totaled 567.75, while Laski's came to 48.8

and Seymour's were 29.9.

And compare a number of Court of Appeals cases that focus on the distinction between the billing rate of an individual who does not specialize in the area of law at issue and the prevailing market rate for services in that area of law, and approving only the latter—such cases as *Buffington v. Baltimore County*, 913 F.2d 113, 129–30 (4th Cir.1990); *Save Our Cumberland Mountains, Inc. v. Hodel*, 857 F.2d 1516, 1521 (D.C.Cir.1988) (en banc); *Shakopee Mdewakanton Sioux Community v. City of Prior Lake*, 771 F.2d 1153, 1161 (8th Cir.1985); and *McCann v. Coughlin*, 698 F.2d 112, 130 (2d Cir.1983).

Here the plaintiff class was represented primarily by Bullock, a lawyer with a deservedly high reputation in civil rights litigation but with no prior background at all in IDEA or other aspects of education law. But on the uncontroverted evidence covering the entire spectrum of *that* type of legal activity, Bullock undertook his maiden voyage into an area of practice that has an established price scale. By sharp contrast with Bullock's claimed rate, highly qualified practitioners in Oklahoma, with broad experience and impeccable reputations earned in the precise areas of practice at issue here, charge not $200 but (even looking at the highest-priced lawyer of that description) between $90 and $140 an hour. And when it comes to the *prevailing* market rate, the uncontradicted evidence pegs that at $125.

We later explain why we do not overturn the district court's rejection of the fragmentation of services in terms of the nature of the work performed from time to time. Instead we affirm the district court's decision to adopt an across-the-board rate. But there is no predicate whatever for the district court's having rejected the uncontradicted record evidence that services are constantly rendered by *all* practitioners in this area at figures ranging from well below $100 to the already mentioned occasional (but rare) $140 charge, and that even a then-current national survey disclosed only three instances of a

rate as high as $135 anywhere in the country, with the norm clustered at $125 and less. That is the stuff of which a prevailing market rate is fashioned, and the expert testimony recounting that information and stating that it denoted a $125 market rate is invulnerable on the record before us.

We therefore conclude that the district court's acceptance of the $200 hourly rate because it represented Bullock's own customary rate in the civil rights and other matters that he handles represented an application of an erroneous legal principle as a matter of law. To avoid the need for still another hearing at the district court level to fine-tune the result, we approve instead the established prevailing market rate of $125 for the services of all the plaintiff class counsel involved in the case.[13]

*Varying Rate*

■ One factor that may perhaps have thrown the district court off the track in its dealing with the competing testimony about hourly rates was the overwhelming mass of detail that was offered up by Department's expert witness in an effort to persuade the court to assign differing values to different types of services. It is of course true, just as in George Orwell's *Animal Farm* ("All animals are equal, but some animals are more equal than others"), that lawyers' services in any given matter may occupy a wide spectrum from the most mundane to those demanding the greatest levels of sophistication and experience. In the hypothetical ideal legal world, if it could be accomplished without the inevitable slippage involved in keeping a number of lawyers apprised of the status of a matter, such routine activities as a court call to report on status could be handled by low-priced associates (or perhaps even by paralegals), while the high-priced partner's time would be devoted exclusively to activities calling for the special abilities that the partner brings to the case.

It is understandable then that some district judges have applied, and some Courts of

13. There is of course no demonstrable reason why Seymour or Laski (the other lawyers approved at the $200 level by the district court) should be valued at a higher figure than Bullock. And though the uncontroverted evidence below was that Patricia Bullock's experience and credentials caused her services to be valued at a lower rate ($145 per hour) than her husband's, that figure was still in excess of the $125 prevailing market rate for comparable services approved here. Thus there is no impropriety in requiring Departments to pay for her services at the $125 figure as well.

Appeals have approved, fee awards involving variable hourly rates (see, e.g., *Delaware Valley Citizens' Council for Clean Air v. Commonwealth of Pennsylvania,* 762 F.2d 272, 278–79 (3d Cir.1985), *aff'd in part & rev'd in part on other grounds,* 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986) and later *rev'd on other grounds,* 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987); *In re Fine Paper Antitrust Litig.,* 751 F.2d 562, 591–93 (3d Cir.1984); *Wojtkowski v. Cade,* 725 F.2d 127, 131 (1st Cir.1984)). We have not had occasion to consider that issue.

Departments' Br. 25 expressly acknowledges that they "realize that it was not legally an abuse of discretion for the district court to refuse to award different hourly rates for different kinds of work." That really disposes of the issue—we reject Departments' invitation that we nevertheless take this occasion to announce (in a kind of constitutionally forbidden advisory opinion, see *CSG Exploration Co. v. Federal Energy Regulatory Comm'n,* 930 F.2d 1477, 1482 (10th Cir.1991)) that such an approach is permissible. For present purposes it is enough that we recognize that the choice of a single figure as the prevailing market rate for lawyers' time involves the recognition that one hour's activity may sometimes be of enormous value to a client and another hour's activity may contribute little (or even nothing) to the overall result, but that a district court's adoption of a composite hourly rate (see, e.g., *Mares v. Credit Bureau of Raton,* 801 F.2d 1197, 1207–08 (10th Cir.1986)—reflecting as it does a practice common to the profession—is a reflection of the average value of all the services rendered by a lawyer.

Accordingly we affirm the district court's refusal to splinter the fee award in terms of the types of services rendered. Consequently the $125 per hour prevailing market rate will be applied to *all* of the hours for which Departments have been held responsible by the district court as modified by this opinion.

### Conclusion

*Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941 has given wise counsel to the federal courts:

A request for attorney's fees should not result in a second major litigation.

Unfortunately the reported cases (to say nothing of innumerable unreported district court rulings dealing with fees) demonstrate that the *Hensley* exhortation must too often be honored in the breach. And here both the district court and we ourselves have been compelled to do the same.

But there is no need to add still another round to this litigation. We find the record more than ample to permit a final resolution here, without doing any violence to the respective roles of a district court and a reviewing court.

We AFFIRM the district court's assessment of fees against Departments in the ESY and Catoosa matters. We REVERSE the district court's determinations in two respects:

 1. the assessment of fees against Departments in the Paulson matter and

 2. the approval of hourly rates, as to which we have ruled as a matter of law that an across-the-board $125 rate is applicable to all approved time spent by all four lawyers for the plaintiff class.

We REMAND for the district court's issuance of a final order in accordance with this opinion. Because each party has prevailed in material part, no costs will be awarded on this appeal.