**Darnell COOPER, et al., Plaintiffs,**

**v.**

**Michael CASEY, et al., Defendants.**

**No. 93 C 1116.**

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 26, 1995.

Steven Douglas McCormick, Roger L. Taylor, Barry E. Fields, and Sarah R. Mar-

mor, Kirkland & Ellis, Chicago, IL, for plaintiffs.

Sandra Ann Castillo, Andrew Neal Levine, Terrance McWhorter, Illinois Attorney General's Office; Susan Takata O'Leary, Illinois Department of Corrections, Chicago, IL, Norma Jean Guess, Daniel C. Shapiro, Moss & Bloomberg, Ltd., Bolingbrook, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

After the March 21, 1995 entry of judgment in accordance with the jury's verdict in plaintiffs' favor in this 42 U.S.C. § 1983[1] action against a number of Stateville Correctional Center personnel, followed by this Court's May 1 ruling on defendants' post-trial motions, plaintiffs' appointed counsel filed a petition for the award of fees and expenses under Section 1988. It then took three more months for that subject to become ripe for decision (defendants filed a lengthy response to the petition—27 pages plus ¾ inches of exhibits—causing plaintiffs' Reply Memorandum to occupy 23 pages plus somewhat less bulky exhibits). And the detailed nature of those submissions, together with this Court's intervening involvement in other cases and other matters on its calendar, has delayed the fees and expenses decision until now.

This Court's careful review of all aspects of the parties' submissions compels the conclusion that plaintiffs' Reply Memorandum, like all the earlier efforts of plaintiffs' appointed counsel on behalf of their clients, reflected time well spent. Instead of slavish adherence to the raw computer printout, the appointed counsel for plaintiffs have cut back substantial amounts of time—both originally before the petition was filed initially, then post-filing after conferring with defense counsel, and most recently in P.R.Mem.Ex. 1. What now remains for decision are defendants' continuing objections to the time devoted by appointed counsel and to the hourly rates sought to be applied to that time. As

---

**1.** Further citations to Title 42 provisions will simply take the form "Section —."

the ensuing discussion reflects, this Court has concluded that on both of those subjects the Reply Memorandum deals with the issues fully and far more persuasively than Defendants' Response to Plaintiffs' Fee Petition.

■ To begin with, there is no question that plaintiffs, though they were not successful on every aspect of their claim, are "prevailing parties" within the meaning of controlling case law (see *Farrar v. Hobby*, —— U.S. ——, ——, 113 S.Ct. 566, 573, 121 L.Ed.2d 494 (1993)). And by sharp contrast with *Farrar*, plaintiffs' success was meaningful indeed: They won $130,000 in damages (even after this Court's post-trial reduction of the jury verdict, which overrode the jury's determination as to one of the codefendants), and they did so in a type of case that is always difficult for plaintiffs—a claim of in-prison excessive force, where the jury must choose between the conflicting testimony of convicted felons on the one hand and correctional officials on the other.[2]

■ Plaintiffs seek "lodestar" recovery— reasonable hourly rates times reasonably expended hours—in accordance with the presumptive starting point in Section 1983 litigation (see, e.g., *McNabola v. CTA*, 10 F.3d 501, 518 (7th Cir.1993)). To depart from that presumptive figure, this Court must provide a "concise but clear explanation" (*Estate of Borst v. O'Brien*, 979 F.2d 511, 515–15 (7th Cir.1992)). No departure is justified here, either as to the rates requested or as to the time spent or because the product of those two components produces an unreasonable result.

■ As for the reasonableness of the claimed hourly rates, in all instances those rates track the charges that are made by plaintiffs' counsel in their customary representation of paying clients. That is the standard set by our Court of Appeals (see, e.g., *In re Continental Illinois Sec. Litig.*, 962

F.2d 566, 568–69 (7th Cir.1992) and cases cited there; *Gusman v. Unisys Corp.*, 986 F.2d 1146, 1150–51 (7th Cir.1993); *Barrow v. Falck*, 11 F.3d 729, 732 (7th Cir.1993); *Tolentino v. Friedman*, 46 F.3d 645, 652 (7th Cir.1995)).[3] In response defendants urge that instead of the market rate charged and paid for services of the lawyers who are actually involved, the awardable rate should be reduced because other experienced civil rights litigators may charge less for their services (defendants support that contention with the affidavit of Timothy Touhy, Esq. ("Touhy"), a lawyer engaged in that area of practice). To that end defendants argue (1) that more recent Seventh Circuit law (*McNabola*) has rendered obsolete the doctrine announced in *Continental Illinois* and *Gusman* and (2) that an opinion written by this Court while sitting by designation with the Court of Appeals for the Tenth Circuit (*Beard v. Teska*, 31 F.3d 942, 956 n. 11 (10th Cir.1994)) teaches "that the requested rates [must be] in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation."

■ To dispatch the latter point first, it cannot be gainsaid that the panel for which this Court spoke in *Beard* announced the rule that it did in a situation where the record reflected an established market price for a specialized legal service that was well below the regular billing rate of the lawyer involved in that case. But nothing supports the notion that generic civil rights litigation falls into such a specialized area—on the contrary, Seventh Circuit decisions (see, e.g., *Barrow v. Falck*, 977 F.2d 1100, 1105 (7th Cir.1992), reconfirmed in *Barrow*, 11 F.3d at 732) make it plain that what a trial lawyer regularly bills for general litigation controls the result for civil rights litigation (viewed as just another area of practice).[4] At least as

---

2. P.R.Mem. 3 reports that after completion of the depositions, plaintiffs' appointed counsel "were willing to open a dialog with defendants regarding settlement," and they told defense counsel "that a total of $20,000 would settle all claims in the case." Not only was that offer rejected, but defendants refused to make any counteroffer.

3. Even apart from that market rate approach (what willing buyers will pay to the willing sellers of the particular lawyers' services), plaintiffs have also provided support for the reasonableness of those rates in more general terms in P.R.Mem.Ex. 6.

4. This of course is quite apart from the fact that lawyers are not fungible. This Court does not

importantly, *Beard* (announcing the law in a different Circuit) drew on a concept (the prevailing rate in the marketplace for such specialized services, rather than the actual experience of the lawyer involved in commanding a price for his or her work) that differed from the approach that has been adopted and reiterated by our Court of Appeals.

As for defendants' other contention, *McNabola* says not a word about discrediting *Continental Illinois* or *Gusman* (and of course the reaffirmation of the principle of those two cases in *Barrow* and *Tolentino* came after rather than before the decision in *McNabola*—something that scarcely supports the notion that *McNabola* had superseded the earlier-announced doctrine[5]). It must also be remembered that in the Seventh Circuit (its Circuit Rule 40(f)) no panel of a proposed opinion can overrule an existing decision—that requires circulation to the entire court for its consideration, and nothing of the sort took place in *McNabola*.

■ Nor is there any indication that it was unreasonable for appointed counsel Taylor (an experienced trial lawyer) to have substantial aspects of the work done by lower-priced lawyers. In a case that by its nature was not a one-lawyer case (and defendants' own handling of this litigation shows that to have been true here), such a division of labor is cost-effective rather than wasteful (so long as the required correlation of activity does not eat up the savings derived from using the second-chair lawyer to do work that he or she can perform at a lower cost). And in this instance both the fee petition and this Court's observation of the proceedings confirms that the lawyers were meticulous in dividing up the work to avoid duplicative activity. That same principle also supports the market-equivalent rates charged for paralegals' time (*Continental Illinois*, 962 F.2d at 569).

So much for the dispute as to hourly rates, which this Court resolves in favor of the market rates established by plaintiffs' submissions. As for defendants' challenges to the reasonableness of the time expended by plaintiffs' counsel, P.R.Mem. 13–21 deals in detail and persuasively with all of defendants' contentions. Just a few of plaintiffs' responses bear highlighting:[6]

1. Defendants' objection to "grouped entries" as somehow rendering plaintiffs' petition "vague and inadequate" is both unrealistic and unreasonable. It is especially ironic when it comes from an office that keeps no time records whatever (although this Court has often urged public law offices—the Attorney General, the State's Attorney, the Corporation Counsel—to do so, in part because that could provide a comparative set of figures that would facilitate the review of fee petitions as to their reasonableness). Anyone who has practiced law knows that on days when multiple aspects of a particular matter occupy a lawyer's time, causing him or her to shift back and forth between those facets, the situation does not lend itself to the kind of particularized breakout that defendants attempt to insist upon in hindsight. There is nothing either unreasonable or improper in the way that the law firm's records were maintained here.

2. Defendants' further objection to time spent by plaintiffs' counsel as duplicative is not well-conceived either. Their

---

deprecate the quality of service rendered by defendants' affiant Touhy—but the fact is that the counsel appointed in this action, Roger Taylor, Esq. ("Taylor") commands a higher price in the market for his services.

5. Look at the language that *Tolentino*, 46 F.3d at 652 quoted approvingly from *Gusman*:

Our recent cases have stressed that the best measure of the cost of an attorney's time is what the attorney could earn from paying clients. For a busy attorney, this is the standard hourly rate. If he were not representing this plaintiff in this case, the lawyer could sell the same time to someone else. That other

person's willingness to pay establishes the market's valuation of the attorney's services. Does that reflect an overturning (even an implied overturning) of *Gusman* by *McNabola?* Hardly.

6. What follows in the text should not be mistaken as any disagreement with any of plaintiffs' other arguments, through some misapplication of the concept of expressio unius est exclusio alterius. On the contrary, this Court expressly approves all aspects of plaintiffs' presentation. What the text merely does is to single out a few items as meriting special mention.

affiant Touhy hypothesizes handling the case in a lesser number of hours, but that type of second-guessing in hindsight discloses no real familiarity with the circumstances of this case as set out at P.R.Mem. 15–18. As has been stated at the outset of this opinion, plaintiffs' reduction from the larger number of actual hours spent by the lawyers here to the lesser number embodied in the final request has eliminated any potential force from defendants' argument. It is worth noting once again that this dispute was not treated as a one-lawyer lawsuit by defendants either—they too took a team approach to the litigation. And once again it is unpersuasive for defendants to cavil at plaintiffs' division of labor as purportedly overlapping and inefficient, when defendants' own expenditure of time cannot be evaluated for comparative purposes because they do not account for their own time at all.

 3. This Court has always been sensitive to the problem of intra-office conferencing whenever litigation reflects overstaffing (see, e.g., *Roe v. City of Chicago*, 586 F.Supp. 513, 514 (N.D.Ill.1984)). In this instance defendants have grossly exaggerated any possible objection in that respect by a sleight-of-hand maneuver: D.Mem. 23 asserts that plaintiffs' counsel seek to be compensated for 138 hours of conferences, meetings and correspondence, whereas their affiant Touhy has rather set out that figure as the total number of hours of *grouped* time entries that include any time devoted to such activities (Touhy Aff. ¶ 10(i))—a different matter altogether. On the record before this Court, it cannot be said that the time spent by counsel as an adjunct to the work being divided up, in order that lower-priced lawyers could perform a substantial part of the activity, represented any wastage of time.

### Conclusion

P.R.Mem. 23 reflects that plaintiffs' further reduction in the requested fees and expenses has brought the final numbers down to $163,276 in attorneys' fees and $12,397.98 in costs and expenses. This Court finds those amounts to be reasonable under the facts and the applicable case law. In accordance with the attached letter from appointed counsel Taylor, defendants are ordered to pay that sum to Kirkland & Ellis Foundation, which is in turn directed to apply those funds (after the payment of out-of-pocket expenses incurred in this litigation) to charitable purposes.